1813.

Philadelphia,
Monday,
July 12.

The Guardians of the Poor *against* GREENE.

IN ERROR.

A clergyman, who *officiates* as such, is not bound to serve as a guardian of the poor, notwithstanding he so far attends to secular business as to keep a store for the sale of merchandize.

THIS was an action of debt in the Common Pleas of *Philadelphia* county, to recover from the defendant the penalty of sixty dollars, prescribed by the act of the 29th of *March* 1803, for refusing to take the oath of office of a guardian of the poor, for the township of the *Northern Liberties*, or to undertake the duties of that office.

The cause was decided below in favour of the defendant in error, upon a case, in the nature of a special verdict, which stated as follows:

The defendant was duly elected to serve as a guardian of the poor, in the month of *November* 1810, by virtue of the act of assembly of the 29th of *March* 1803; and refused to take the necessary oath for the faithful performance of the said office, within ten days after his election or appointment. He also refused to take upon himself the said office. He was duly ordained a deacon in the Methodist Episcopal church on the 6th of *May* 1787. He was duly appointed an elder of the said church on the 25th of *September* 1788, and from the time of his ordination till this day, has fulfilled all the duties required of him in his different stations, by the rules of the said church. On the day of his election, he acted as a local preacher of said church, and had, among others, the following duties assigned him by the stationed preacher, which he fulfilled. (The case then stated a variety of ecclesiastical duties performed by the defendant, between the 30th of *September* 1810, and the 15th of *January* 1811, in general recurring weekly.) He had a similar routine of duty assigned him after the expiration of the time in the before mentioned list stated, and has regularly had assigned to him since, duties which he has regularly fulfilled. He was a travelling preacher in the said congregation, from *May* 1783 until *June* 1800, about which time he married a lady who kept a dry good store, and obtained permission from the proper authority to locate. *Local* preachers of the Methodist Episcopal church, are not bound to travel abroad: they have no salary allowed them, except when they officiate as *stationed* preachers. They have not the pastoral charge of any particular

congregation, except in case of the sickness or absence of the stationed preacher, when called upon; and are considered as being subject to receive appointments from him, when to officiate and perform divine service. The defendant, by the rules of the said church, is authorised to assist, and usually has assisted, in the ordination of preachers, to perform the rites of baptism, marriage, and burial, and to administer the sacrament, which none but elders can do. Local preachers are obliged to attend class meetings. The bishops of the said church, and the stationed preachers, besides their travelling expenses, have eighty dollars allowed them as salary. The defendant for ten years before his election, kept a dry good store, and part of that time he kept two stores, to which his wife chiefly attended. Local preachers of the said church have heretofore been elected to serve as guardians of the poor, and have not objected to serving, but have taken upon themselves the execution of the said office; but no local preacher that has done this, was an elder.

The question arising from the foregoing facts is, whether the defendant is liable to the penalty prescribed by the 2d and 15th sections of the act of the 29th of *March* 1803.

*Ewing* for the plaintiffs in error. The act of 1803 provides for the election of *substantial house-keepers*, inhabitants of the city, district or township, and citizens of the state. It requires no other qualification in a guardian of the poor. It exempts none from the obligation of serving, who come within that description. The defendant being therefore within the plain words of the law, and the law containing no express exception in his favour, he is bound to serve, unless he establishes an implied exception in the clearest manner.

An implied exception in his favour, is negatived by an express exception in other laws, such as the militia law, by which ministers of religion of every denomination, are in terms exempted from military duty. *Purdon's Abr.* 368. If the legislature had entertained a similar purpose in relation to guardians of the poor, they would have introduced a similar exception.

Incompatibility of duties may be alleged. There is none between the duties of a guardian of the poor, and those of a clergyman. Though the office is temporal, it is in the highest degree charitable, and affords the largest field for the exercise

and display of the clerical virtues. It brings into notice the greatest number of objects, both for religious counsel, and pecuniary relief. Whatever may be the calls of some clergymen, the argument of incompatibility is peculiarly weak in this case, where the defendant has no cure of souls, is rarely called to officiate, except as the casual substitute of a stationed preacher, and is occupied with the concerns of trade, of all branches of business the most in collision with the duties of a clergyman. His own life is a complete answer to the argument of incompatibility.

The exemption of the clergy from the burden of temporal offices, is in _England_ a fruit of the establishment. None at common law enjoy the privilege, but the clergy of the established church; and it has required the interposition of the legislature to relieve the dissenting clergy, who, until late time, sustained in common with the laity all temporal burdens. 1 _W. & M. c._ 18. _s._ 11, and 31 _Geo._ 3. _c._ 32. This privilege, which is a badge of political distinction, cannot exist here, where every thing like an establishment has been pointedly put down. Our law confers no privileges upon that body of men. Venerable as they are, it has been thought sufficient to remove from them all disabilities. They are capable of sustaining any office, and the converse should be true, that they are exempt from none, except where expressly exempted by law.

The obligation to serve as overseer of the poor, is peculiarly extensive, even in _England._ None but the established clergy, those privileged by statute, and those who are officers of the king, bound to attend his person, his courts, or some department of his government, are exempt. 1 _Botts' Poor Laws_ 5, 6. A woman may be appointed if there is none other. 1 _Botts_ 7. Courtesy usually passes over the clergy, and excuses them from serving as jurors, and even as guardians. But the question is now as to the right; and that is not supported either by common or statute law.

_Allibone_ and _Tod_ for the defendant. The words of the act, are, it is true, general; but this is the strongest argument for implied exceptions. According to the plaintiffs' doctrine, justices of the peace, officers of the state and federal governments, attornies at law, and even the judges of this Court, are liable to serve as guardians of the poor. Such can never have been the intention of the legislature, and such is not the

true construction of the act. On the contrary, the legislature must have intended exceptions, and it is for this Court to say which they are by the principles of the common law, or by our own usage since the first settlement of the state. If a privilege exists at common law, a statute must contain negative words to destroy it. *Jolliffe* v. *Langston* (a).

There is then an obvious incompatibility between the duties of a clergyman, and those of any temporal office, which is the foundation of a common law privilege to be exempt. A clergyman, says *Blackstone*, cannot be compelled to serve on a jury, nor can he be chosen to any temporal office, in regard of his own continual attendance on the sacred function. 1 *Black. Com.* 376. Lord *Coke* says, that "the common " law, to the intent that ecclesiastical persons might the better " discharge their duty in celebration of divine service, and " not be entangled with temporal business, hath provided, " that if any of them be chosen to any temporal office, he " may have his writ *de clerico* &c." 1 *Inst.* 96. *a.*, 2 *Inst.* 3, 4. Dr. *Lee* was discharged from the office of *expenditor* for *Rumney Marsh*, in consequence of being archdeacon of *Rochester*, though his predecessors for many years had executed the office. 1 *Mod.* 282., 1 *Ventr.* 105. *S. C.* And other cases are express to the same point. *Vicar of Dartford's case* (b), *Chambers's case* (c). In an anonymous case in 6 *Mod.* 140, a clergyman was held to be privileged from the office of overseer of the poor, though he appeared to have no cure of souls.

If this privilege was confined to the clergy of the established church, which does not any where distinctly appear, it was not in consequence of any reason growing out of the establishment, but because the law did not recognise the clergy of any other denomination. In this country all denominations are recognised; all therefore should be considered as privileged in the same degree, as the favoured denomination in *England.*

Our own usage has admitted the privilege. Clergymen have never been called to serve as jurors, or in any temporal office against their will; and if any argument is derived from the circumstance that local preachers of the Methodist church have served as overseers, it is answered by the fact that elders have not.

(a) 1 *Lord Ray.* 342.     (b) 2 *Stra.* 1107.    (c) *Andrews* 353.

1813.

GUARDIANS
of the
POOR
*v.*
GREENE.

The defendant is in the full exercise of his clerical functions, according to the discipline of his church. That he attends to secular business through the agency of his wife, to procure a livelihood which his church does not afford him, is of no moment. Clergymen are frequently engaged in the instruction of youth. When this is voluntary, they can so regulate the duty, as to make it compatible with the higher duties of religion; but they are no longer at liberty to attend to the service of God, if they are bound to discharge a temporal office. This is the true ground of privilege, and one from which no well regulated society can wish to remove this important and venerable body of men.

TILGHMAN C. J. The question in this case is, whether the defendant in error, an ordained deacon, and an elder in the Methodist Episcopal church, is subject to the penalties of the act of the 29th of *March* 1803, for not serving in the office of a guardian of the poor, to which he was elected. There is no doubt but the commonwealth has a right to insist on the service of every member of the community, in any capacity in which it may be thought proper to exact it. But unless the intention is clearly expressed, it is not to be supposed, that services were meant to be exacted contrary to ancient usage, and involving incompatible duties. Every country has its common law. Ours is composed partly of the common law of *England*, and partly of our own usages. When our ancestors emigrated from *England*, they took with them such of the *English* principles as were convenient for the situation in which they were about to place themselves. It required time and experience to ascertain how much of the *English* law would be suitable to this country. By degrees, as circumstances demanded, we adopted the *English* usages, or substituted others better suited to our wants, till at length, before the time of the revolution, we had formed a system of our own, founded in general on the *English* constitution, but not without considerable variations. In nothing was this variation greater than on the subject of religious establishments. The minds of *William Penn* and his followers would have revolted at the idea of an established church. *Liberty to all, but preference to none;* this has been our principle, and this our practice. But although we have had no established church, yet we have not been want-

ing in that respect, nor niggards of those privileges, which
seem proper for the clergy of *all religious denominations.* It
has not been our custom to require the services of clergy-
men in the offices of constables, overseers of the highways,
or of the poor, jurors, or others of a similar nature. Not
that this exemption is founded on any act of assembly, but
on an universal tacit consent. In the nature of things, it
seems fit, that those persons who devote their lives to the
service of God, and the religious instruction of their brethren,
should be freed from the burthen of temporal offices, which
would but distract their attention, and may be better filled
by others. This sentiment is not peculiar to us. We find it
in the *English* common law, though from motives of policy
restricted perhaps to the established church. It is said by
Lord *Coke*, in 2 *Inst.* 3, 4, to be a principle of the *ancient
common law*, that the clergy shall not be implicated in secu-
lar business; and that if a man holding lands, by virtue of
which he is bound to serve in temporal offices, become an
*ecclesiastical person in holy orders*, he ought not to be elected
to such office, and if he is, he may have the king's writ for
his discharge. And in the *Register of Writs* 187, and *Fitz.
N. B.* 175, the form of the writ is to be found. It appears
then, that what the *English* have applied to their *established
church*, we in conformity to our principles of religious liber-
ty, have granted to the clergy of *all professions.* Nor is the
privilege confined to common law offices. It is proved by the
cases cited in the argument to which I refer, that the same
construction has been held with respect to offices created by
statute, in which there is no express exemption of the clergy.
The rule of construction is this: unless the clergy are men-
tioned, it shall not be supposed that it was intended to in-
clude them. If we apply this rule to the act of assembly in
question, the case will be easily decided. The act directs
that a certain number of *substantial householders* shall be
elected, but is altogether silent as to any exemptions. We
must presume then, that it was not intended to include per-
sons who, from ancient usage, were exempt from this kind of
service, or who held other offices incompatible with the duty
of a guardian of the poor. Without such presumption, how
is it, that judges and attorneys at law are privileged? They
have no express privilege by that or any other law, but in

1813.

GUARDIANS
of the
POOR
*v.*
GREENE.

1813.

GUARDIANS
of the
POOR
*v.*
GREENE.

sound construction they are excepted from the general words of the act. It has been contended, however, that granting this to be the true construction of the law, yet Mr. *Greene* is subject to the penalty, because he has forfeited his privilege. It is true, that every man may waive his privilege. We have instances in this state of ordained clergymen holding the offices of register of wills and prothonotary of the Court of Common Pleas, and in *England* they very commonly execute the office of justice of the peace. But how has Mr. *Greene* waived his privilege? He has become what is called in the Methodist church, *a local* or *located minister*, (one that does not travel), and he has kept a shop for mercantile business, which has been principally managed by his wife; but he has constantly *officiated* as a minister of the gospel in this city. His services indeed have not lately been so weighty as formerly, but he is subject to an increase of them at any moment, according to the discipline of his church. I am not for measuring too nicely the length and breadth of clerical duties and employments. While a man is an *acting minister*, it is sufficient to entitle him to the privileges of his order. Too minute a scrutiny on this point, would involve us in unnecessary and unprofitable difficulties. Different societies require from their ministers different degrees of service. In all it has been deemed decent and proper, that the clergy should devote part of their time to the instruction of youth in seminaries of learning, and in *some* they are permitted to pursue any business to which they are inclined, without any restriction. I would leave it to each society to regulate its own clergy; and until the legislature shall think proper to express its will to the contrary, I shall be for extending equal privilege to the mitred bishop and the unadorned *friend*.

My opinion is, that the Court of Common Pleas were right in their construction of the act of assembly, and therefore their judgment should be affirmed.

YEATES J. The words of the second section of the act of the 29th of *March* 1803, though general in their nature, must be restrained by a reasonable construction. Although the guardians of the poor are to be elected out of substantial housekeepers, who are citizens, I should suppose that it was not the intention of the law, that a woman should be elected, while there were other fit persons to fill the office.

At common law, I apprehend no persons in holy orders could be compelled to serve in a temporal office, upon the ground that their time should be devoted to the sacred duties of their station, and their minds abstracted from secular affairs, as far as is possible. An entire abstraction cannot be reasonably expected. Means must be procured for the support of a family; and frequently both here and in *Great Britain*, the cultivation of land and instruction of youth are recurred to for that purpose. In this point of view I regard the defendant's keeping a dry good store by his wife or a clerk. If independently of this circumstance, he would be exempted from service in this office, the pursuing of such an occupation would not abridge that right.

But it has been urged by the plaintiffs in error, that the privilege contended for by the defendant, exists by the common law of *England* only in the cases of clergymen of the established church, and that the privilege as to other ministers of religion is granted by statutes. It is true that by *art.* 9. *sec.* 3., of our constitution, it is declared, " that no preference " shall ever be given by law to any religious establishments " or modes of worship." All religious societies are placed on the same broad equal ground, and the only test of office is the acknowledgment of the being of a God, and a future state of rewards and punishments. But if the exemption of clergymen of the established church in *England* from the burden of temporal offices, is founded on the solid principles of moral fitness, decency and public policy, is it not more correct to assert, that ministers of religion of all denominations amongst us should participate in that privilege, than that it should wholly cease to exist? It is of great importance to the peace and good order of society, that the character of public exhorters of our religious duties, should be held in the highest respect and veneration. Their influence on the conduct of the people at large will be impaired by compelling them to serve as guardians of the poor, constables, and other petty officers.

The uniform opinion which has prevailed as to clergymen in general not being compellable to serve as jurors, fortifies the defendant's pretensions in the present instance. It has subsisted both before and since the *American* revolution. The provisions of the act of the 29th of *March* 1805, as to the selection of jurors, are general in their nature, and contain no exceptions. The sheriff and commissioners are enjoined to-

put into the wheel the names of *sober* and *judicious* persons, and a fine not exceeding twenty dollars is imposed on those who shall refuse to serve as jurors. The burthen is intended to fall equally on every citizen fit to discharge that duty. And yet both before and since the passing of that act, public ministers of all denominations returned as jurors, have uniformly been excused by the Court on their application. There is a seeming incompatibility of character, when we unite the *divine* and the *juror.* I may be permitted to say the divine owes superior duties to society. Whence is it that the judges of other Courts would be excused from serving as jurors in this Court, or as guardians or overseers of the poor, supervisors of the highways, or constables? Upon what ground would the professors of the law rest their claim to exemption, when returned to either of these offices? I answer, on the same ground of incompatibility of character, and of their owing higher duties to the community, which public policy requires the faithful discharge of in the first instance. Indeed we ourselves would have no other plea to recur to, when called upon by another Court to fulfil the duties of either of those offices. The faithful pastor, who conscientiously watches over his flock, and teaches them their duties to their Creator and fellow men, will have but little leisure to attend to temporal pursuits.

I am of opinion that the judgment of the Court of Common Pleas should be affirmed.

BRACKENRIDGE J. There is no trace of the *privilegium clericale* in the New Testament, in the epistles, in the fathers, in the history of early christianity. It was not until the *Roman* empire became christian, that persecution ceased and privilege began. But from that time it made a very rapid progress. On the clearing away of the mist of the dark ages, we find it settled down with the *jure divino* right of tithes, and endless immunities. The church establishment in *England* has become a part of the common law. But was the common law in this particular or any part of it, carried with us in our emigration and planting a colony in *Pennsylvania?* Not a particle of it. On the contrary, the getting quit of the establishment and ecclesiastical tyranny and immunity, was a great cause of the emigration. All things in this particular were reduced to primitive christianity, and we took a new

state. A teacher of religion of any denomination was unknown to our laws; no clerical exclusion, no immunity. But it has been customary with the people not to impose secular employments on clerical functionaries. I believe the speakers in assemblies amongst the people called Friends, claim no such exception. With other denominations, even where the cure of souls becomes an employment, it is matter of courtesy not to impose; but immunity is not a claim of right. The act of assembly proves this, which exempts in the case of militia service. This is not in affirmance of a common law known to us, it is introductory of a new privilege. The exemption proves a preceding obligation. *Exceptio unius exclusio est alterius.* In our commonwealth there is no exclusion from office to a clergyman, from public trusts; and why an immunity? *Qui sentit commodum, sentire debet et onus.*

Why talk of an incompatibility? There is no constitutional incompatibility, no legal impediment, nothing in the nature of the case. All trades and occupations might as well plead avocations, and set up an incompatibility. In a state where every individual may constitute himself a public teacher of religion, and allege the cure of souls, the plea of incompatibility would work a general inconvenience. If indulged to the full extent, and what is there to limit it, it would work a general inconvenience. But there is no law or usage to justify such a plea. I will venture to say it is the first time that it was ever heard of in a court of justice in *Pennsylvania.* It cannot be allowed, and my judgment is for the plaintiffs.

Judgment affirmed.